UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| GISELE A. CHILD-OLMSTED | : | |
| | : | |
| V. | : | CIVIL ACTION NO.: |
| | : | CCB-04-3559 |
| LOYOLA COLLEGE | : | |

# MEMORANDUM

The plaintiff, Gisele Child-Olmsted, filed suit on September 21, 2004 for breach of contract in the Circuit Court for Baltimore City against her employer, Loyola College, after her request for an early retirement benefit was denied.  The defendant removed the case to this court on the basis that the matter is covered by the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § § 1001 *et seq*., and therefore this federal court has exclusive jurisdiction.  The plaintiff filed a motion to remand, arguing that the early retirement benefit was not an "employee welfare benefit plan" covered by ERISA, and therefore there was no basis for federal jurisdiction.  For the reasons that follow, the plaintiff's motion to remand will be granted.

**BACKGROUND**

At the time this dispute arose in the fall of 2001, Gisele Child-Olmsted was a tenured, full professor at Loyola College. (Compl. ¶ 3.) She was 54 years old and had been employed by the College for eighteen years. (*Id.* ¶ 4.) She began an approved sabbatical leave of absence in June 2001 (*Id.* ¶ 15). While she was on sabbatical in the fall of 2001 the defendant distributed its Faculty Handbook of September 2001 to her and the rest of the faculty. (*Id.* ¶ 5.) Among other things, the Faculty Handbook included a description of the College's Voluntary Early Retirement Program ("VERP"), a program that had been established previously by the College to provide certain financial support to eligible, regular, tenured faculty who wished to retire prior to the normal retirement age of 65. (*Id.* ¶¶ 6-7.) Under the VERP all regular, tenured, faculty members whose age plus years of service added together were equal to or greater than the sum of 70 were eligible for early retirement. Participants in the VERP would receive an early retirement severance payment upon termination of tenured employment. (*See* Pl.'s Motion to Remand, Ex. 1, "Voluntary Early Retirement Program for Faculty.") The Faculty Handbook contained a formula showing that the severance payment would be calculated based on a combination of age, salary, and number of service years. (*Id.*) The VERP provided four ways in which a participant could receive the severance payment: (1) twenty-four semi-monthly installments; (2) forty-eight semi-monthly installments; (3) a lump sum deposit into the participant's annuity plan; or (4) a lump sum payment. (*Id.*) While participants would still have access to their accumulated retirement accounts, they would not receive post-retirement benefits from the college, although they could set aside part of their severance payment for benefits and they could continue to participate in the College's group health insurance through COBRA. (*Id.*)

The Faculty Handbook included provisions describing the process for participation in the VERP.  The Handbook specified that "[e]ligible faculty shall provide written notification to their Chairperson and to the appropriate Dean by October 1 of their planned last academic year of employment," and that "[e]xceptions to the October 1 deadline will be considered on the basis of extraordinary circumstances." (*Id.*)  The Handbook stated that "[f]inal approval rests with the Vice-President for Academic Affairs." (*Id.*)  The Handbook explained that the Vice President "may deny an application and will provide a written rationale for the denial," and then listed three factors that could justify denial, all relating to the impact of the early retirement of the faculty member on the College.[1]  In addition, the Handbook provided that "[i]f a large number of applications have been received for early retirement in the same year, and the above three situations do not apply, applications will be prioritized on the basis of most years of service."  In closing, the VERP description stated that "[t]he College reserves the right to amend or terminate [the program], in full or in part, at any time." (*Id.*)  This is consistent with an earlier statement in the VERP description that "[p]eriodically, a report detailing the financial implications of the plan is presented to the President.  A recommendation to continue or discontinue the plan will be made at the conclusion of each review." (*Id.*)

The plaintiff states that while on sabbatical leave she learned on or about November 14, 2001 from a colleague that the College's Vice-President for Academic Affairs, David Haddad, Ph.D.,

---

[1]The Vice-President of Academic Affairs could deny an application if he determined that granting the application would: (1) lead to difficulties in meeting contractual, financial, legal or other obligations by which the College is bound; (2) negatively affect an audit, accreditation or any other review to which the College or any of its programs may be subject; (3) seriously disrupt the conduct of a College operation or program.  (*Id.*)

3

intended to recommend to the President and Board of Trustees of the College that the VERP be discontinued.  (Compl. ¶ 18.)  On or about November 15, 2001, the plaintiff notified the defendant's Human Resources Department that she wished to retire pursuant to the VERP.  (*Id.* ¶ 19.)  According to the plaintiff, at this time, the VERP remained in full force and effect.  (*Id.* ¶ 20.)  The plaintiff then applied for early retirement with the instructions provided to her by the Human Resources Department. (*Id.* ¶ 22.)  In accordance with guidance from the Human Resources Department, the plaintiff next contacted the office of Vice-President Haddad to request an appointment with him at the earliest possible time in order to continue the application process.  (*Id.* ¶ 23.)  She was scheduled for the first available appointment on December 10, 2001.  (*Id.* ¶ 24.)  On that day, she met with Vice-President Haddad.  He informed her that her application for early retirement was not timely inasmuch as the VERP had been terminated by the College five days earlier on December 5, 2001.  (*Id.* ¶ 25.) According to the plaintiff, the Vice-President nonetheless represented to her that he would attempt to secure her participation in the program.  (*Id.* ¶ 26.)  Months later, Vice-President Haddad notified the plaintiff that the College would not permit her to participate in the early retirement program because the program had been terminated.  The plaintiff then filed suit, alleging that the defendant breached its contractual obligation to permit her to retire either by accepting her application as it was presented or by granting an exception based upon "the extraordinary circumstances" of her being on approved sabbatical leave during the time when the termination of the program was contemplated and carried out. (*Id.* ¶ 28.)

## ANALYSIS

The sole issue before the court is whether the defendant's Voluntary Early Retirement Program ("VERP") constitutes an "employee welfare benefit plan" as defined by ERISA. If it does, then by the preemptive force of ERISA, this court has exclusive jurisdiction over the claim, and the motion to remand must be denied. If the VERP is not an ERISA plan, then this court lacks subject matter jurisdiction over the matter and the motion to remand must be granted.

Removal of cases from state court to federal court is appropriate when the federal district court has original jurisdiction, as it does in a "federal question" case, that is, "a case arising under the Constitution, laws, or treaties of the United States.'" *Metropolitan Life Ins. Co. v. General Motors Corp.,* 481 U.S. 58, 63, 107 S.Ct. 1542, 1546 (1987) (quoting 28 U.S.C. § 1331). Generally, under the "well-pleaded complaint rule," a federal cause of action only arises if the plaintiff's complaint raises issues of federal law. *Id.; Pinney v. Nokia, Inc.,* 402 F.3d 430, 442 (4th Cir. 2005) (noting also that "a plaintiff is master of the claim, and he may avoid federal jurisdiction by exclusive reliance on state law in drafting his complaint") (citations and internal quotations omitted).

In limited circumstances, a state common law complaint, such as the one at issue in this case, may nonetheless convert into one stating a federal claim, if it "is necessarily federal in character by virtue of the clearly manifested intent of Congress." *Metropolitan Life Ins. Co.,* 481 U.S. at 67. Courts have recognized that claims involving employee welfare benefit or retirement plans may present such a situation due to the exclusive preemption provision contained in ERISA. *Id.* at 66-67; *see also Holland v. Burlington Indus. Inc.,* 772 F.2d 1140, 1146-47 (4th Cir. 1985) (observing that the "sweeping federal preemption" provision "must be given broad effect") (citations and quotations omitted). Section 514(a) of ERISA preempts "any and all State laws insofar as they may now or

hereafter relate to any employee benefit plan" covered by ERISA. 29 U.S.C. § 1144(a). "State laws" "encompass[] not only statutes but also common law causes of action, such as [plaintiff's] claim for breach of contract." *Gresham v. Lumberman's Mutual Casualty Co.,* 2005 WL 844728, ___ F.3d ___ (4th Cir. 2005). In analyzing when state claims are preempted by ERISA, the Supreme Court has looked to "the language of ERISA's pre-emption provision, the underlying purpose of that provision, and the overall objectives of ERISA itself." *Fort Halifax,* 482 U.S. 1, 7, 107 S.Ct. 2211, 2215 (1987). First, the Supreme Court has noted the important distinction between "employee benefits" and "employee benefit *plans,*" observing that Congress meant to preempt only the latter. *Id.,* 482 U.S. at 8. In other words, "[a]n employer's decision to extend benefits does not constitute, in and of itself, the establishment of an ERISA plan." *Kulinski v. Medtronic Bio-Medicus, Inc.,* 21 F.3d 254, 256 (8th Cir. 1994). In providing that ERISA would preempt state laws related to employee benefit plans, Congress's intent was to "establish a uniform administrative scheme" so that employers operating in more than one state would not be subject to conflicting regulations. *Fort Halifax,* 482 U.S. at 9-11 (citing *Shaw v. Delta Airlines, Inc.,* 463 U.S. 85, 103 S.Ct. 2890, 2894 (1983)). This policy decision was made in recognition of the fact that "employers establishing and maintaining employee benefit plans are faced with the task of coordinating complex administrative activities," and Congress did not want conflicting regulatory burdens to cause employers to reduce benefits or refrain from offering them. *Id.* at 11. This is likewise consistent with Congress's goal that by imposing uniform regulatory standards for employee benefit plans, ERISA "would safeguard employees from 'such abuses as self-dealing, imprudent investing, and misappropriation of plan funds.'" *Id.* at 15 (quoting 120 Cong. Rec. 29932). "The focus of [ERISA] thus is on the administrative integrity of benefit

plans–which presumes that some type of administrative activity is taking place." *Id.*

In *Fort Halifax,* while reviewing whether a Maine law that required employers to provide a one-time severance payment to employees in the event of a plant closing was preempted by ERISA, the Supreme Court outlined a number of factors that indicate whether an employee benefit constitutes an ERISA "plan." First, the Court reasoned that the Congressional concerns reflected in ERISA only arise "with respect to benefits whose provision by nature requires an ongoing administrative program to meet the employer's obligation." *Id.* at 11. The Court determined that the Maine statute's "requirement of a one-time, lump-sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation." *Id.* at 12. The Court reasoned that:

> The employer assumes no responsibility to pay benefits on a regular basis, and thus faces no periodic demands on its assets that create a need for financial coordination and control. Rather, the employer's obligation is predicated on the occurrence of a single contingency that may never materialize. The employer may well *never* have to pay the severance benefits. To the extent that the obligation to do so arises, satisfaction of that duty involves only making a single set of payments to employees at the time the plant closes. To do little more than write a check hardly constitutes the operation of a benefit plan.

*Fort Halifax*, 482 U.S. at 12.

The Fourth Circuit has applied the *Fort Halifax* analysis in an unreported decision, *see Lomas v. Red Storm Entertainment, Inc.,* 49 Fed. Appx. 396, 400 (4th Cir. 2002), reversing summary judgment where an employee's severance agreement "does not require an administrative scheme and it does not appear to be an employee benefit plan as defined by ERISA." In so ruling, the Fourth Circuit stated that it was "impressed by and find[s] persuasive the decision of one of our sister circuits." *Id.*

7

(citing *Kulinski,* 21 F.3d at 258) (focusing on whether a severance agreement required "the establishment of a separate, ongoing administrative scheme to administer the promised benefits," to find that the company exercised no discretion and was required only to write a check).

In keeping with the framework developed by the Eighth Circuit, as well as other circuit courts and district courts in this circuit, I will analyze whether the defendant's early retirement program created an "ongoing administrative scheme" that required it to exercise discretion in such a way that the benefit program would be considered an ERISA plan. *See, e.g., Tinoco v. Marine Chartering Co.,* 311 F.3d 617, 622 (5th Cir. 2002) (finding that severance benefits provided under an early retirement program were not covered by ERISA because the program did not "require[] an administrative scheme to make ongoing discretionary decisions based on subjective criteria"); *O'Connor v. Commonwealth Gas Co.,* 251 F.3d 262, 268-69 (1st Cir. 2001) (finding that severance bonus and other early retirement incentives tied to years of service were based on "objective" and "mechanical" determinations and therefore did not implicate ERISA); *Velarde v. Pace Membership Warehouse, Inc.,* 105 F.3d 1313, 1317 (9th Cir. 1997) (holding there was no ERISA plan because "the employer was simply required to make a single arithmetical calculation to determine the amount of the severance benefits" and there was no need for an "ongoing administrative scheme"); *Emery v. Bay Capital Corp.,* 354 F.Supp.2d 589, 593 (D.Md. 2005) (describing factors used to determine whether an ERISA plan exists, including "whether the severance payments came due upon the occurrence of a single, unique event or whenever the employer terminates the employees" and "whether the severance arrangement...requires the employer to engage in a case-by-case review of employees"); *Donovan v. Branch Banking & Trust Co.,* 220 F.Supp. 2d 560, 564-65 (S.D.W.Va. 2002) (same); *cf.*

8

*Emmenegger v. Bull Moose Tube Co.,* 197 F.3d 929, 935 (8th Cir. 1999) (holding that the company's severance plan was covered by ERISA because "the decision to pay benefits is made on an individual, ongoing basis, after exercising the discretion described in the plan"); *Cecil v. AAA Mid-Atlantic, Inc.,* 118 F.Supp. 2d 659, 664 (D.Md. 2000) (holding that supplemental retirements benefits constituted an ERISA plan because the company was required to "manage [the employee's] accounts, and distribute to him the premiums to which he was entitled" on an ongoing basis).

It is clear that severance pay, such as the early retirement severance pay at issue in this case, can be considered an "employee benefit" as that term is defined under ERISA. *See Massachusetts v. Morash,* 490 U.S. 107, 116, 109 S.Ct. 1668, 1673 (1989) (citing *Holland v. Burlington Indus. Inc.,* 772 F.2d 1140 (4th Cir. 1985)); *cf. Biggers v. Wittek Ind., Inc.,* 4 F.3d 291, 295 (4th Cir. 1993) (observing that "[a] *plan* established by an employer providing for severance pay benefits is an employee welfare benefit plan covered by ERISA") (emphasis added). What is less certain is whether the College's early retirement program constituted an ERISA "employee benefit *plan.*" The plaintiff insists that it did not, emphasizing that no ongoing administrative scheme existed to administer the VERP. Rather, the plaintiff contends, participant eligibility was "determined in a purely mechanical manner," because the VERP description provided that "[a]ll regular, tenured, faculty members whose age plus years of service added together are equal to or greater than the sum of 70 are eligible to participate." (*See* Pl.'s Mot. to Remand at 2-3.) According to the plaintiff, approval of a faculty member's application was "virtually automatic;" apparently the College never denied an eligible faculty member's request for early retirement pursuant to the VERP. (*See* Pl's. Reply to Def.'s Opp. at 2). The plaintiff notes that according to the College's records "[s]ince 1997, approximately 2 to 3 faculty

9

members have applied for early retirement each year." (*See* Pl.'s Reply to Def.'s Opp., Ex. 2, March 13, 2002 Meeting Minutes of the Loyola College Board of Trustees). Apparently, once the College announced that it was considering terminating the program in 2001, seven faculty members applied and were approved for the program. (*Id.*)

Furthermore, the plaintiff maintains that little to no employer discretion was exercised in determining the severance pay amount, because the VERP provided a formula based on employee salary and years of service to calculate the benefits. Once the final sum was calculated by the formula, the College would simply execute the payment according to the retiree's wishes. Therefore, the plaintiff maintains, the College did not undertake any long-term obligation with respect to payments that would create "periodic demands on its assets [that require] financial coordination and control." (Pl.'s Mot. to Remand at 6) (quoting *Fort Halifax,* 482 U.S. at 12) (internal quotations omitted). Rather, the severance payment was "triggered by a single event, that is, the decision of the eligible faculty member to retire." (*Id*.) The plaintiff contends that the VERP represents the sort of "agreement[] involving one-time or short-term payouts upon the termination or retirement of an employee [that does not] constitute [an] ERISA plan[]." (*Id.* at 4) (quoting *Cecil,* 118 F.Supp. 2d at 664).

The defendant disputes this characterization as an over-simplified view of the VERP. According to the College, the VERP required the Vice-President of Academic Affairs to exercise considerable discretion, in that there were several factors that might justify denial of a faculty member's request for early retirement. *See supra* note 1. The defendant further argues that because the VERP provided that a participant could elect "to have the monies dispersed over one year, two years, in a lump sum, or deposit[ed] into the faculty member's regular annuity plan with the remaining balance paid

in a lump sum payment," such "a menu of options require[d] a greater need for administration of the plan." (*See* Def.'s Opp. at 5.)  Finally, the defendant urges the court to focus on Supreme Court and Fourth Circuit cases that have stated that employee severance benefit plans can be employee welfare benefit plans covered by ERISA, *see Fort Halifax,* 482 U.S. at 7 n.5; *Massachusetts v. Morash,* 490 U.S. at 116, *Holland,* 772 F.2d at 1145; *Biggers,* 4 F.3d at 295, rather than the cases from other jurisdictions relied on by the plaintiff.

The cases relied on by the College, however, are not readily applicable to the facts presented in this case.  For example, in both *Fort Halifax* and *Morash,* the Supreme Court merely cited *Holland* for the proposition that severance pay plans may be considered employee welfare benefit plans, without analyzing whether a voluntary early retirement benefit program, such as the one at issue in this case, was an ERISA welfare benefit plan.  *See* 482 U.S. at 7 n.5; 490 U.S. at 116.  In *Holland,* which pre-dates *Fort Halifax,* the Fourth Circuit determined that severance pay provided to employees after they were *involuntarily* terminated "due to circumstances such as elimination or modification of operations or other job elimination due to bona fide organization changes," related to the employer's welfare benefit plan and therefore was covered by ERISA.  772 F.2d at 1143-44 (internal quotations and citations omitted).  Similarly, the *Biggers* court relied on *Morash* to find that a severance plan that provided pay to employees after a plant closing was an employee welfare benefit within the scope of ERISA, even if it only applied to one employee.  4 F.3d at 297.  In each of these cases, the benefits at issue were contingent upon the occurrence of an event outside the employee's control, and thus operated as a kind of safety net that the employees could expect to rely on, in a way that implicated ERISA.  *See Morash,* 490 U.S. at 115-16 (noting that "[t]he distinguishing feature of most of these benefits [referring to

medical, sickness, accident, and disability benefits , etc.] is that they accumulate over a period of time and are payable only upon the occurrence of a contingency outside the control of the employee"). The *Morash* court specifically noted that "[i]t is unlikely that Congress intended to subject to ERISA's reporting and disclosure requirements those vacation benefits which by their nature are payable on a regular basis from the general assets of the employer *and are accumulated over time only at the election of the employee*." 490 U.S. at 116 (emphasis added). Therefore, these cases cannot be read to require, as the defendant urges, that any benefit plans involving severance pay are automatically considered ERISA employee welfare benefit plans. Rather, the severance pay plan at issue in this case was a strictly voluntary early retirement program, thus making it more like the plans the Supreme Court noted would likely be outside the scope of ERISA. *Id.*

Indeed, the VERP appears to more closely resemble the severance pay plans deemed not covered by ERISA in cases in other circuits. *See, e.g., Tinoco,* 311 F.3d at 623 (finding that early retiree health benefits discontinued by employer were not employee welfare benefit plans under ERISA); *O'Connor,* 251 F.3d at 268-69 (early retirement severance bonus was not covered by ERISA because it was administered in an "objective" and "mechanical" manner); *Velarde,* 105 F.3d at 1317 (determining that employer's "stay on bonus" and severance pay was not an ERISA plan because the employer exercised only "slight" discretion in administering the plan). *Cf. Emenegger,* 197 F.3d at 935 (finding that severance plan constituted an ERISA plan because the record showed the employer exercised discretion in such a way that in "each case someone must make an ad hoc judgment about the reason for the employee's termination and evaluate the quality of that person's service"). While the defendant insists that the VERP required the Vice-President to exercise considerable discretion and

12

review each applicant for approval, it appears, as the plaintiff has argued, that little discretion was exercised and that approval was "virtually automatic." A minimal exercise of discretion does not convert an early retirement plan into an employee welfare benefit plan under ERISA.

Those factors that did exist were focused on the college's institutional health, rather than the individual applicant's qualifications for the program. Such factors, which apparently were designed to enable the employer to exercise some control over the possible financial and organizational impact of the early retirement program, likewise do not constitute the sort of discretion that implicates ERISA. *See, e.g., O'Connor*, 251 F.3d at 265 (although the employer "reserved the right to limit participation [in an early retirement plan] to 300 employees, and to delay the retirement of any employee who elected to participate for up to one year," the court ultimately found there was little discretion involved and therefore the plan was not covered by ERISA).

Moreover, the defendant's argument that an ongoing administrative scheme was created because the VERP provided four different payout options, at least one of which obligated the College to make payments over a two year period, is not persuasive.[2] Courts have recognized that severance benefits providing for installment payments over an extended period of time need not trigger ERISA obligations. *See, e.g., Tinoco,* 311 F.3d at 622 ("severance plans that provide certain benefits over a period of time do not necessarily require an ongoing administrative scheme") (citing *Fontenot v. NL Industries, Inc.,* 953 F.2d 960 (5th Cir. 1992)); *Cecil,* 118 F.Supp. 2d at 664 (noting that "agreements involving one-time or short-term payouts upon the termination or retirement of an

---

[2]Similarly, the fact that the VERP apparently was paid out of general assets versus a separate trust fund is not dispositive. *Fort Halifax,* 482 U.S. at 17-18 (citing *Holland*, 772 F.2d 1140).

13

employee do not constitute ERISA plans") (citing *Delaye v. Agripac, Inc.,* 39 F.3d 235, 237 (9th Cir. 1994); *Kulinski,* 21 F.3d at 258; *Angst v. Mack Trucks, Inc.,* 969 F.2d 1530 (3d Cir. 1992)).

The VERP was created to provide incentives for early retirement in an effort to better facilitate the entry of new professors into the faculty ranks. When the College determined that the financial burdens of this program outweighed the benefits, the Board of Trustees voted to eliminate it. The defendant argues this is precisely why the VERP should be considered covered by ERISA-- this kind of discretion strikes at the heart of Congress's concern that employees not be left out in the cold by their employers. I disagree. According to the program description, the VERP could have been eliminated at any time, and it was essentially voluntary, both on the part of the College and on the part of the eligible participants. Under this voluntary early retirement plan, "[t]he employer assume[d] no responsibility to pay benefits on an ongoing basis." *Fort Halifax,* 482 U.S. at 12.[3]

In short, the defendant has failed to demonstrate that the VERP necessitated an "ongoing administrative scheme" that required the kind of "discretionary determination...that triggers an employer's fiduciary obligation to its beneficiaries." *O'Connor,* 251 F.3d at 269. Accordingly, the VERP was not an "employee welfare benefit plan" within the meaning of ERISA. As a result, this court lacks subject matter jurisdiction over the plaintiff's claim, and this case must be remanded to the Circuit Court for Baltimore City.

A separate order follows.

---

[3]By this analysis, I am expressing no opinion on the merits of the plaintiff's contract claim against the College.

| | |
|---|---|
|    April 28, 2005    |    /s/    |
| Date | Catherine C. Blake |
| | United States District Judge |